907 So.2d 1248 (2005)
Lane VAUGHN, Appellant,
v.
PROGRESSIVE CASUALTY INSURANCE COMPANY, etc., et al., Appellees.
No. 5D02-3755.
District Court of Appeal of Florida, Fifth District.
July 29, 2005.
*1249 Robert E. Turffs of Robert E. Turffs, P.A., Sarasota, for Appellant.
Terence R. Perkins of Smith, Hood, Perkins, Loucks, Stout & Orfinger, P.A., Daytona Beach, for Appellee Progressive American Insurance Company.
Paul H. Field, of Lane, Reese, Aulick, Summers & Field, P.A., Coral Gables, for Appellees APAC-Florida, Inc. and PJS Excavating, Inc., n/k/a Delta Milling, Inc. of Lake County.
SAWAYA, J.
Lane Vaughn appeals the Amended Final Judgment entered in his personal injury action. He argues that the trial court's prejudicial comments about the evidence and his counsel in the presence of the jury worked to prejudice the jury against him, as demonstrated by the jury's damage award and its finding of comparative negligence. Although other issues are raised by Vaughn, our resolution of this particular issue renders the others moot.
*1250 Vaughn filed a personal injury action seeking benefits under the uninsured/underinsured coverage of his automobile insurance policy issued by Progressive American Insurance Company. He also sought damages from APAC-Florida, Inc. and PJS Excavating, Inc., now known as Delta Milling, Inc. of Lake County, which Vaughn claims had been involved in the construction and repair work along the section of I-95 where the accident occurred.
Vaughn alleged that he was involved in a single-car accident that occurred on I-95 in the early morning hours. Vaughn further alleged that while he was driving, he noticed a phantom vehicle approaching him from behind and exhibiting erratic behavior. He was watching the vehicle in his rear-view mirror when he ran off the interstate and allegedly struck a pile of asphalt that he claims was negligently deposited along the roadway by construction crews. His vehicle overturned several times in the median, resulting in his injuries.
The nineteen-day jury trial ended with a jury verdict finding that the damages totaled $400,000. Vaughn's comparative negligence was set at 70%, while APAC and Delta were each found to be 15% negligent. Progressive was found to be without fault. Vaughn claims that the trial judge, in the presence of the jury, repeatedly rebuked his counsel and improperly commented on the evidence. As a result, Vaughn contends that the jury was prejudiced against him, as reflected in the amount of damages awarded and the percentage of comparative negligence attributed to him.
Reading Vaughn's brief, one might get the impression that the trial judge, in many noted instances, treated opposing counsel with the utmost courtesy and consideration, but by harsh and intimidating demeanor sought to debase and discredit Vaughn's counsel and impugn his credibility in the presence of the jury. We can find no reasonable basis for the contention that the trial judge intentionally showed favoritism toward one side over the other; rather, it is readily apparent from the record that he showered his wrath upon all participants, although much appears to have been directed toward Vaughn's counsel. Therefore, we believe that counsel for Vaughn appears altogether too ready to attribute favoritism and unworthy motives to the trial judge in his attempt to seek a reversal here.
Be that as it may, when we look at the transcripts of the trial proceedings, we see a senior trial judge worried about time constraints placed upon him by his assignment as a senior judge to this particular trial, impatient and frustrated with the lawyers and the proceedings, and who, at times, lost his composure in the presence of the jury by taking his frustrations out on the lawyers, especially on counsel for Vaughn. At the risk of unduly burdening the reader with tedious and boring information, we believe it necessary to include extensive quotes from the trial transcript to show the extent of the rebuke of Vaughn's counsel in the presence of the jury. What follows are some of the more salient excerpts that Vaughn claims warrant reversal. The cast of participants are: the court; Mr. Haynes, counsel for Vaughn; Mr. Reese, counsel for APAC; Mr. Nelson, the dismissed juror; and the witnesses, who shall remain nameless.
[THE WITNESS]: No, sir, I ain't seen no pictures about that.
MR. REESE: I would object, your Honor. There have been no pictures admitted into evidence or identified or *1251 anything else about what he's talking about. And no witness has testified about it.
THE COURT: Just a moment. I think what we've been hearing for the biggest part of this afternoon is a bunch of argument, as best I can characterize it. From this point on, we have about 35 minutes before we recess for the day, I'm going to insist that you put your questions in succinct, carefully worded manner so they're understandable by this witness, Mr. Haynes. And I want this witness to answer your question yes or no, and then he can explain his answer without any argument. Do you understand that, gentlemen?
THE WITNESS: Yes, sir.
THE COURT: Because at 5:00 we're going to walk out of here. I don't know where you all are going, but I'm leaving. I've had about all of this I want for one day. From what I see on the faces of the occupants of this courtroom, I think everybody here has, too.
All right. Now, you may proceed with that, and let's leave this argument outside the courtroom. I'm not going to have it anymore. All right. Go ahead.
. . . .
[MR. HAYNES]: And then you had the  I can't even read my own writing. What follows  the broom sweeper, that's what comes next, isn't it?
MR. REESE: Your Honor, if I may, I have to object as being totally repetitive. Miss Jones spent three hours yesterday explaining this paving train and the whole bit, and we're going to go through this again. There was no paving train out there at the time of the accident. It doesn't have anything to do with the accident. The accident happened at three in the morning. And to go through the whole paving train thing again is totally repetitive and not helping the jury at all.
MR. HAYNES: Your Honor, that is not an objection, it's an argument, and I object to it.
THE COURT: Well, the Court objects, and I'm going to instruct you to move this thing along. You're dragging your feet. This thing is taking on an element of redundancy I have seldom seen in the courtroom. Let's move on with this examination or we'll be forever with this one witness.
Go right ahead now, Mr. Haynes. Let's pick up our feet and move along. Go right ahead, sir.
MR. HAYNES: The Court didn't respond to my objection.
THE COURT: Your objection is overruled.
MR. HAYNES: My objection to the speaking argument objection.
THE COURT: Your objection is overruled, sir. I have ruled. Please move along. And don't make me have to remonstrate with you people. Try to keep this case moving. We will be here forever at the pace that we have achieved here. We'll never finish this case.
MR. HAYNES: But, Judge, we've not been able to get the records they [sic] permit us to know with any certainty and what we need to know and what we think the jury needs to know.
THE COURT: What the jury needs to know and what the Court needs to know may be two different things. What the jury needs to know are matters that are relevant to this case. We're just digging our feet into every *1252 little hole we come along upon and we're giving this jury matters they have no interest in or nothing to do with the case at all. So let's stick to the basic concept of relevancy. And if there ain't relevance, don't mention it.
Don't move the Court all over the state digging up information about some other job or some other activity that was going on with this company or with these people. Let's stick with the things that are relevant to this particular lawsuit. And if it's not relevant, don't stop to look at it.
Go right ahead, sir, please.
MR. HAYNES: Thank you 
THE COURT: And please move along.
MR. HAYNES:  your Honor.
MR. HAYNES: Looking at Sunday the 19th  and before we leave Saturday, you don't have any specific memory as to when you were off job site on Saturday 
[THE WITNESS]: No, sir.
[MR. HAYNES]:  the I-95 job site? Or when the job actually shut down on Saturday?
[THE WITNESS]: No, sir.
THE COURT: Sir, what does that have to do with this case?
MR. HAYNES: Your Honor, the accident happened on Saturday night after the midnight hour.
THE COURT: We don't know that. That's not been established. There's no evidence in the record of that.
MR. HAYNES: That's what I'm trying to establish.
THE COURT: I've heard no evidence in the record that the accident even happened, for that matter.
MR. HAYNES: You haven't?
THE COURT: No, I haven't.
"It cannot be too often repeated, or too strongly emphasized, that the function of a . . . trial judge is not that of an umpire or of a moderator at a town meeting."[1] A trial is not a game of sport where umpires engage in heated discussion with players who have allegedly broken the rules, and it is not a town meeting where moderators scold citizens who promote their self-interests or voice their grievances in a manner and with language unbecoming the solemnity of a courtroom. Rather, a trial is a formal proceeding where "every litigant is entitled to nothing less than the cold neutrality of an impartial judge" charged with the duty to ensure that every grievance is fairly resolved in accordance with the rules of evidence and trial procedure. State ex rel. Davis v. Parks, 141 Fla. 516, 194 So. 613, 615 (1939).[2] The requirement of neutrality
helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception *1253 of the facts or the law. At the same time, it preserves both the appearance and reality of fairness, "generating the feeling, so important to a popular government, that justice has been done," Joint Anti-Fascist Committee v. McGrath, 341 U.S. 123, 172, 71 S.Ct. 624, 649, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring), by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him.
Marshall v. Jerrico, Inc., 446 U.S. 238, 242, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980) (citation omitted).
Trial judges must be fair, impartial, and disinterested participants in the proceedings. It is their obligation to see that justice is done and to that end, they have no more important duty than to ensure that the facts are properly developed through compliance with the rules of evidence and trial procedure and that those facts relevant and material to the questions at issue are fairly and properly presented to the jury. To fulfill that duty, trial judges should not hesitate to rebuke counsel who attempt to circumvent the pertinent evidentiary and procedural rules, delay the proceedings, or engage in antics that prejudice the fair administration of justice.
When the trial court believes that counsel's misbehavior or improper conduct warrants rebuke, the trial court must attempt to do so in a manner that does not disfavor one party to the jury. See Gomez v. State, 751 So.2d 630, 632 (Fla. 3d DCA 1999) ("The trial court retains the ultimate responsibility for the proper conduct of trial counsel and trial proceedings in her courtroom."). Thus, in such instances, the court should make every attempt to admonish counsel outside the hearing of the jury. Id. at 633 ("When objections are sustained and the trial court considers it proper to admonish counsel, it should be done outside the jury's presence. However, if counsel continues to engage in improper comments and arguments, the trial judge should admonish counsel and advise them that future improper tactics will cause counsel to be rebuked before the jury. This has a magical effect!"); Medina v. Variety Children's Hosp., 438 So.2d 138 (Fla. 3d DCA 1983).
In Whitenight v. International Patrol & Detective Agency, Inc., 483 So.2d 473 (Fla. 3d DCA), review denied, 492 So.2d 1333 (Fla.1986), for example, among other comments made, the trial judge indicated that plaintiff's counsel was wasting the court's and the jury's time, and the comment was overheard by at least one juror. The circumstances of that case warranted reversal. Id. at 475. Here, under circumstances more egregious, the trial court's repeated rebuke of Vaughn's counsel in the presence of the jury clearly placed the trial judge in an adversarial position to Vaughn's counsel and prevented the trial judge from exercising the fairness and impartiality required to ensure that all parties receive a fair trial.
Moreover, we believe that the court impermissibly commented on the evidence when, as counsel for Vaughn was attempting to establish the date and approximate time of the accident through the testimony of a witness, the court exclaimed, "We *1254 don't know that. That's not been established. There's no evidence in the record of that. . . . I've heard no evidence in the record that the accident even happened, for that matter." This commentary was not only directed to the testimony of the witness but clearly revealed the judge's view of all of the evidence presented by Vaughn up to that point as he attempted to prove the elements of his cause of action. In order to ensure that all litigants receive a fair trial, the courts adhere to the general principle that "[a] trial court should scrupulously avoid commenting on the evidence in a case." Whitfield v. State, 452 So.2d 548, 549 (Fla.1984). This general principle has been codified in section 90.106, Florida Statutes (2003), which provides that "[a] judge may not sum up the evidence or comment to the jury upon the weight of the evidence, the credibility of the witnesses, or the guilt of the accused." The Law Revision Council's Note appended to this statute reveals that the basis for this enactment emanates from Hamilton v. State, 109 So.2d 422, 424-25 (Fla. 3d DCA 1959), which explained:
The dominant position occupied by a judge in the trial of a cause before a jury is such that his remarks or comments, especially as they relate to the proceedings before him, overshadow those of the litigants, witnesses and other court officers. Where such comment expresses or tends to express the judge's view as to the weight of the evidence, the credibility of a witness, or the guilt of an accused, it thereby destroys the impartiality of the trial to which the litigant or accused is entitled.
The record reveals that the cumulative effect of the trial court's conduct in the instant case may have improperly influenced the jury. Vaughn argues that the remarks made by a juror who was forced to leave the trial early evidences the impact the trial court's remarks may have had on the jury:
THE COURT: Thank you, Mr. Nelson. I invited you here this morning to tell us about the problem that you are involved with in connection with your jury service. Would you tell these gentlemen and lady what you told the bailiff earlier today.
MR. NELSON: Yes, sir. First off, yesterday afternoon you asked us if this is going any longer would it cause any problems. I didn't know it would because I thought things were fine at work. I work for a small company. Eight people. That's it. We're gun import.
THE COURT: Just slow it down a little bit. She has to write all this down.
MR. NELSON: All right. Which means all the paperwork has to be right. Day-to-day, I usually handle this. I have a couple of people that work with me that aren't used to doing the same thing that I am. They're beginning to run into problems because I'm not there to do my job. It's becoming detrimental to the company that I'm not there. I thought they could struggle through this week, minor inconvenience, go back next week. Minor problem. Not like that any longer.
Secondly, I just found out that I'm not being paid for the whole time I'm here, and the difference between my paycheck is where I'm going to run into problems financially.
Lastly, if I'm asked to stay here, I don't think I could be as objective as I started out being because I know where most of the time is being eaten up, and *1255 that's going to make me resent the plaintiff. And that's pretty much it.
Jurors have a high regard for the judge because they believe him or her to be a fair, impartial, and learned participant in the proceeding, and thus the expression of any opinion regarding the evidence or rebuke of counsel by the judge generally has great weight with them. Hence, inappropriate remarks by the judge often result in improper influence on the jury, thereby vitiating the atmosphere of absolute impartiality that is supposed to emanate from the bench where the judge presides. That is what happened here and as a result, Vaughn was deprived of a fair trial.
We emphasize that we are not to be understood as reflecting on the character or integrity of the judge whose conduct we have reviewed. We think the judge was involved in a highly contentious trial between litigants bent on achieving a result to their liking and who unduly prolonged the proceeding as they maneuvered to that end. We also note that the judge was under time constraints that put additional pressure on him to move the trial to its ultimate conclusion. Nevertheless, the trial judge committed numerous mistakes of judgment that are no less erroneous because they were committed unintentionally. We are not at liberty to content ourselves with the bare recognition of the legal principles we have discussed and their mere repetition as affable, legal platitudes; indeed, we have no alternative but to apply them effectively where the facts justify it. We, therefore, reverse the judgment and remand this case for a new trial before another judge.
REVERSED AND REMANDED FOR NEW TRIAL.
PETERSON, J., concurs.
THOMPSON, J., concurs specially, with opinion.
THOMPSON, J., concurring specially.
In this case, the experienced senior judge was under the dual pressure of completing the case before his certification expired and dealing with obstreperous lawyers. By the senior judge's own comments, his remarks were intemperate.[1] Perhaps this pressure precipitated the judge's behavior. Regardless of the reason, the comments were inappropriate.
The outcome of this case hinged in part upon the testimony of the appellant, the only witness who observed the accident. The jury heard testimony that the appellant was a suspended Florida Bar attorney who had not been forthright about the reason for his suspension. The jury also heard from hospital personnel that he was under the influence of narcotics at the time of the accident. Plaintiff's testimony is always important in personal injury case, but in this case the credibility and character of the appellant were more significant. Thus, the trial judge's comments that the appellant's attorney was delaying and extending the trial cast the appellant's case, if not the appellant, in an improper light, as evidenced by the testimony of the discharged juror.
Perhaps the public's perception of trial judges is that they are rude, abrasive, *1256 curt, and given to sarcastic remarks because of media's depiction of judges. However, Canon 3 of the Code of Judicial Conduct requires judges to be patient, dignified, and courteous to litigants and their lawyers because their demeanor may shape the trial's outcome and will cause the public's confidence in the judiciary to be undermined.[2] Because the judge's behavior was intemperate and may have conveyed to the jury the judge's predilection as to the outcome, reversal is the only solution to ensure that the appellant receives a fair trial.
NOTES
[1] Barba-Reyes v. United States, 387 F.2d 91, 93 (9th Cir.1967) (quoting Simon v. United States, 123 F.2d 80, 83 (4th Cir.), cert. denied, 314 U.S. 694, 62 S.Ct. 412, 86 L.Ed. 555 (1941)); see also Quercia v. United States, 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321 (1933) ("[T]he judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law.").
[2] In Williams v. State, 143 So.2d 484, 488 (Fla.1962), the court explained that

[w]hen judges permit their emotions or the misapplication of legal principles to shunt them away from it, they must be reversed. The judge must above all be neutral and his neutrality should be of the tough variety that will not bend or break under stress. He may ask questions to clarify the issues but he should not lean to the prosecution or defense lest it appear that his neutrality is departing from center. The judge's neutrality should be such that even the defendant will feel that his trial was fair.
[1] THE COURT: Just a moment. You know, in 50 years, I've never used one of these, but I'm fixing to use it heavy today and hard. I want people in here talking one at a time. Ladies and gentlemen, I apologize to you for my apparently, intemperate remarks, but I will not permit my courtroom to be used in this fashion.
[2] 3. A Judge Shall Perform the Duties of Judicial Office Impartially and Diligently
* * *
B. Adjudicative Responsibilities.
* * *
(4) A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers, and of staff, court officials, and others subject to the judge's direction and control. (e.s.)
(5) A judge shall perform judicial duties without bias or prejudice. A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice. . . .